UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DIANA G. GARCIA,

                                    Plaintiff,                         16-CV-08174 (SN)

                  -against-                                            <u>OPINION & ORDER</u>

NANCY A. BERRYHILL, COMMISSIONER OF
SOCIAL SECURITY,

                                    Defendant.
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 8/15/2017

**SARAH NETBURN, United States Magistrate Judge:**

      Diana G. Garcia seeks judicial review of the Commissioner of Social Security's determination finding her disabled only from May 12, 2012, to June 1, 2013, but denying her disability insurance benefits ("DIB") for any time before or after that date. 42 U.S.C. § 405(g). Garcia claims that her disability—resulting in pain in her lower back pain, right knee, and left hand—persisted after June 1, 2013. An Administrative Law Judge ("ALJ") determined that the medical evidence did not support Garcia's account of her symptoms' persistence and credited the opinion of a consultative examiner who testified that Garcia was capable of working within the full range of sedentary work after June 1, 2013.

      Garcia and the Commissioner cross-move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). I conclude that the ALJ's disability determination was supported by substantial evidence and free from legal error. Accordingly, Garcia's motion for judgment on the pleadings is DENIED, and the Commissioner's cross-motion is GRANTED.

# BACKGROUND

## I.    The Administrative Record

Garcia applied for DIB on October 13, 2012, alleging disability since April 17, 2010, as a result of back pain, resulting in surgery, and lumbar radiculopathy[1]. Garcia's application was denied and she requested a hearing before an ALJ. On May 21, 2013, Garcia appeared pro se before ALJ Seth Grossman. After a brief examination, Judge Grossman adjourned the hearing in order to subpoena additional medical records and secure an orthopedic expert and vocational expert. A supplemental hearing was held on February 21, 2014, at which Garcia appeared with counsel. In addition to Garcia, orthopedic expert Dr. Malcolm A. Brahms and vocational expert Raymond E. Cestar testified. The ALJ considered Garcia's application *de novo*. The ALJ rendered a decision on May 12, 2015, finding that Garcia was disabled for the closed period from May 12, 2012, to June 1, 2013, but not for any time before or after that period. This decision became the Commissioner's final decision when the Appeals Council denied review on August 24, 2016.

### A.  Garcia's Testimony

Garcia testified that her last job was as a dispatcher associate for Cable Vision. She performed data entry and assisted technicians remotely in installing cable boxes in customers' homes. She worked at Cable Vision for 11 years until she was terminated in April 2010 because of her disability. As a dispatcher associate, she sat without any need for lifting. Garcia received unemployment benefits for two years after being terminated from Cable Vision. In order to receive unemployment benefits, she was required to certify that she was ready, able, and willing

---

[1] Lumbar radiculopathy is nerve irritation caused by damage to the discs between the vertebrae; this damage itself may occur because of degeneration or wear and tear of the outer ring of the disc, traumatic injury, or both.

to work. Garcia admitted that, during those two years, she would have been able to work if she needed to support herself.

Garcia reported "complications with sitting" and "sharp pains" in her back after undergoing back surgery in December 2012. Administrative Record ("AR") at 54, 74. Because of her back pain, Garcia could not sit for more than 15 minutes at a time. See id. at 96. Although she no longer experienced numbness radiating down her legs, she rated her back pain as an "eight" on a 10-point scale, which was the same level of pain she felt before the December 2012 surgery. Id. at 76–77. In addition to back pain, Garcia reported a torn right knee medial meniscus,[2] for which she was prescribed a brace, and carpal tunnel, swelling, and numbness in her right hand. She testified to using a cane for at least one year. Garcia also claimed to suffer from depression. She last saw a psychiatrist in 2009.

In terms of activities of daily living, Garcia read the Bible, occasionally watched television, and socialized with her family. She relied on her family and boyfriend to buy groceries, prepare meals, and clean. She was unable to lift a gallon of milk.

### B. Medical History

#### 1. Dr. Hanny Hernandez

On September 10, 2012, Garcia reported pain in both feet to podiatrist Dr. Hernandez, who diagnosed her with bursitis[3] and injected her left foot with lidocaine. At a follow-up appointment a month later, Dr. Hernandez noted that the pain was localized to Garcia's left foot,

---

[2] A torn meniscus is a tear to the semicircular cartilage in the knee joint, causing pain to the inside of the knee.
[3] Bursitis is inflammation or irritation of the bursa, which is a sac filled with lubricating fluid located between bone, muscle, tendons, and skin, that decreases rubbing and friction.

concluding that she had plantar fasciitis[4] and tendonitis[5]. He again injected Garcia's foot with lidocaine and advised her to wear a night splint and to modify her footwear.

Garcia denied any stiffness, pain or swelling in her left foot at a November 5, 2012 visit with Dr. Hernandez, who diagnosed her with athlete's foot.

Garcia did not see Dr. Hernandez again until March 4, 2013, when she presented with bilateral foot pain while walking. Dr. Hernandez assessed bursitis and plantar flexion deformity. She returned to Dr. Hernandez on June 3, 2013, with complaints of left foot pain. Dr. Hernandez did not find any instability of the left foot but discussed surgical management and anti-inflammatory medication and encouraged her to modify her shoes.

Garcia again presented with foot pain at an October 2013 appointment. She had orthotics but did not use them. Dr. Hernandez instructed her to wear the orthotics and to modify her shoes. She visited Dr. Hernandez on November 4, 2013, with complaints of fungal toenails but no pain.

In January 2014, Garcia informed Dr. Hernandez that her foot pain was "getting better." AR at 673–75.

### 2. Dr. Ali Guy

Garcia visited Dr. Guy on September 20, 2012, with reports of lower back pain radiating down her left leg. Garcia had tried physical therapy without improvement. Based on a physical examination, Dr. Guy concluded Garcia had diffuse tenderness and spasm but an active range of motion and a normal gait. Dr. Guy referred Garcia to Dr. Joshua Auerbach for a surgical consultation.

In a follow-up appointment on October 25, 2012, Garcia presented to Dr. Gray with continued pain in her lower back, right knee, and both hands. Dr. Guy noted that Dr. Auerbach

---

[4] Plantar fasciitis is inflammation of the thick band of tissue along the bottom of the feet that connects the heel bone to the toes.
[5] Tendonitis is inflammation or irritation of a tendon.

had recommended surgery after examining Garcia. On examination, Dr. Guy observed that Garcia's right knee was swollen with a popliteal cyst and that both of her thumbs had osteoarthritic deformities. Garcia's gait was normal. Dr. Guy referred her to Dr. Gabriel Dassa for an evaluation of her right hand and knee pain.

### 3. Dr. Joshua Auerbach

Dr. Auerbach examined Garcia on October 8, 2012. A physical examination revealed a normal gait and a positive straight leg raise on the left. Dr. Auerbach found Garcia to be neurologically intact. He diagnosed Garcia with foraminal disc herniation with anterolisthesis[6] and recommended that Garcia consider surgery, given that physical therapy, medications, and epidural injections had not relieved her pain.

On December 5, 2012, Garcia underwent posterior lumbar L4-S1 fusion surgery performed by Dr. Auerbach. Upon her discharge on December 19, 2012, Garcia was instructed to walk as much as she felt able to; limit stair climbing to only a few times per day; not bend from the waist; limit lifting to less than 10 pounds with no twisting when lifting and carrying; and limit sitting to 20 or 30 minutes at a time.

After the surgery, Dr. Auerbach consistently described Garcia's condition as improving. At a December 28, 2012 follow-up appointment, he observed that Garcia "ha[d] done beautifully" with "no complications." AR at 295. Garcia had "no leg pain and only mild back pain." She was "at home walking upright with no leg pain and mild back pain doing very wonderfully and is very happy with her progress today." Id. There was "no gait abnormality" and "minimal pain." Id. Upon examination, Garcia had a negative straight leg raise bilaterally and

---

[6] Anterolisthesis is a spine condition in which the upper vertebral body slips forward onto the vertebra below.

was able to "heel, toe walk without difficulty." Id. Dr. Auerbach instructed Garcia to avoid bending, twisting, and lifting.

In February 2013, Garcia was doing "beautifully from the clinical standpoint," with "no leg pain." Id. at 585. She could walk without any assisted devices. Overall, she appeared to be "improving very nicely." Id. Although she reported "mild to moderate back pain," Dr. Auerbach believed such pain was "obviously expected in early postoperative time point." Id. Overall, Dr. Auerbach was optimistic that Garcia would "continue to heal." Id.

Garcia visited Dr. Auerbach on May 2, 2013 for another re-evaluation. Garcia was again "doing beautifully" with "mild low back pain" and "no pain going down the legs." Id. at 587. Garcia's pain was generally "well under control." Id. She denied any "gait abnormalities." Id. Although she was wearing a back brace, Dr. Auerbach did not think she needed it.

At an August 2, 2013 visit, Garcia's post-surgery outcome remained "excellent," her lower back pain had significantly improved from her pre-surgery condition, and she experienced no leg pain. Id. at 701. As of the appointment, Garcia was "back to work on a light-duty capacity" but she was still experiencing "difficulties sitting or standing for more than 45 minutes at a time." Id. Garcia reported being able to "sit up to 45 minutes" and "stand for periods for time as well," though she needed to "take little breaks." Id. Based on a physical examination, Dr. Auerbach concluded that Garcia was "still in the recuperative process" and was "not fully spinally healed yet." Id. He recommended that "she continue to do light-duty capacity" and that she change position every 30 minutes and take frequent breaks. Id. Garcia would also "occasionally require to take a day off." Id. Overall, Garcia was "very happy with her surgery" and had "done really well" despite "some limitations as expected after a large surgery like this." Id.

### 4. Dr. Gabriel Dassa

Dr. Dassa reviewed x-rays of Garcia's right foot, left shoulder, and left hand that were taken in November 2012 and March 2013. The November 2012 x-ray of the right foot showed changes of the first and second metatarsal bones and a flattened plantar arch. The March 2013 x-rays of her left shoulder and left hand were unremarkable.

At a September 2013 visit with Dr. Dassa, Garcia presented with pain in her right knee. She had received a cortisone injection during a previous visit that "alleviated two thirds of her pain" and requested a new injection. Id. at 698. Garcia did not wish to continue physical therapy. Dr. Dassa observed that Garcia had a normal range of knee motion and her motor strength was full at 5/5.

Garcia visited Dr. Dassa on November 5, 2013, for a follow-up on a previously administered injection into the carpal metacarpal of her left hand. According to Garcia, the injections "relieved a lot of her pain," and she was overall "very pleased [with] operative treatment." Id. at 692. Garcia, however, requested additional cortisone injections "due to the excessive walking and use over the last couple weeks." Id. She rated her pain as a "3/10." Id. Dr. Dassa administered cortisone injections and provided a "return to work" slip for "light duty with less than 30 minutes of standing, sitting, and ambulating." Id. at 693.

At a January 15, 2014 appointment, Garcia presented with increased pain from standing. Dr. Dassa observed that both of Garcia's knees had a full, active range of motion. Garcia requested cortisone injections, indicating that physical therapy was of little help.

### 5. Dr. Melanie Maclennan

Garcia visited Dr. Maclennan on November 8, 2012, for a physical examination, which revealed unremarkable findings. Dr. Maclennan observed that Garcia was able to maintain "good balance." AR at 635.

At an appointment on April 17, 2013, Garcia complained of back pain to Dr. Maclennan, who observed abnormalities in Garcia's gait, spine stiffness, tenderness, and scoliosis. Dr. Maclennan encouraged Garcia to continue taking Percocet and Cymbalta.

### 6. Caroline Luke, Nurse Practitioner

At a visit with Nurse Practitioner Caroline Luke on May 23, 2013, Garcia complained that her back pain was "coming back with pinching sensations." AR at 631. She also reported "pain with sitting too long" and "pain with walking." Id. Garcia, however, was capable of walking a mile with breaks and a back brace. A physical examination revealed an abnormal gait and pain in the lumbar spine region.

At a visit with Nurse Luke on June 10, 2013, Garcia's only concerns were hand pain and a desire to lose weight. Garcia's left hand showed swelling and tenderness. Nurse Luke diagnosed Garcia with neuropathy of her left hand and referred her to a hand surgeon.

### 7. Dr. Evan Schwechter

Garcia visited Dr. Schwechter on June 17, 2014, for an evaluation of right knee pain complaints. Upon examination, Dr. Schwechter observed that her knees were stable and neurovascularly intact. In addition, Garcia's hips had a normal range of motion.

### C. Consultative Examinations

#### 1. Dr. Jose Corvalan

Dr. Corvalan performed a consultative examination on February 11, 2013, in connection with Garcia's DIB claim. Garcia mentioned her December 2012 back surgery and reported "constant" pain in her lower back that was aggravated by sitting, standing, walking, bending, climbing stairs, and lifting and carrying heavy objects. AR at 551. Regarding activities of daily living, Garcia was able to cook twice a week; bathe and dress herself; and clean, do laundry, and shop with help. She spent most of her time watching television, listening to the radio, reading, going to doctor appointments, and shopping for food. During the examination, Garcia ambulated with a walker and rose from the chair with some difficulty but did not need any help changing for the examination. Her hand and finger dexterity were intact. There was some tenderness on palpation of the lumbar spine area.

Dr. Corvalan diagnosed Garcia with low back pain. He opined that she had "moderate limitation[s]" for sitting or standing for long periods of time, walking long distances, bending, squatting, climbing stairs, lifting, and carrying heavy objects. Id. at 553.

#### 2. Dr. Malcolm A. Brahms

Orthopedic surgeon Dr. Brahms attended the February 21, 2014 supplemental hearing after reviewing Garcia's medical records. He testified that six months after Garcia's December 2012 surgery, she had "no restrictions against sedentary work." AR at 83. Any functional restrictions were only "standing a long time and lifting heavy objects" as a result of her back problems. Id. In response to whether Garcia would be able to speak on the phone or perform data entry, Dr. Brahms responded that she was capable of "fine manipulations." Id. at 84. Garcia was also capable of sitting for eight hours in a given day, provided that she could take breaks. Dr.

Brahms opined that Garcia was "absolutely" healed. Id. at 85. When directed to his diagnosis of Grade I spondylolisthesis, Dr. Brahms asserted that it was not considered a significant impairment. Dr. Brahms referred to arthritic changes in Garcia's right knee as of "minimal consequence." Id. at 81. He concluded that Garcia was limited to sedentary activity as of June 1, 2013.

On July 31, 2014, in response to interrogatories sent by the ALJ, Dr. Brahms affirmed that Garcia was disabled for the closed period from May 12, 2012, to June 1, 2013, but that she was able to perform sedentary activity after June 1, 2013. He noted that after the surgery in December 2012 (which had provided some benefit), the back pain, though less severe, persisted. In reviewing a February 2014 CT scan, Dr. Brahms found that the internal fixation was intact but that there was "slight spondylothesis[7] at L4-5." AR at 740. Dr. Brahms observed no instability in her right knee. He also found evidence of arthritic changes in Garcia's thumb that had not yet been treated.

In a Medical Source Statement of Ability to do Work-Related Activities, dated July 31, 2014, Dr. Brahms indicated that Garcia could occasionally lift and carry up to ten pounds; that she could sit for up to two hours, stand for 30 minutes, and walk for 30 minutes at one time without interruption; and that she could sit for six hours, stand for two hours, and walk for one hour at one time without interruption. Garcia could also perform activities like shopping; travel without a companion for assistance; walk without using a wheelchair, walker, canes or crutches; use public transportation; prepare a simple meal and feed herself; and care for her personal hygiene.

---

[7] Spondylothesis is a condition in which one bone in a person's back slides forward over the bone below it. This condition most often occurs in the lower spine.

### D. Vocational Expert

At the February 21, 2014 supplemental hearing, vocational expert Raymond E. Cestar first testified that Garcia's previous job as a dispatcher was sedentary. When asked whether a hypothetical claimant capable of performing the full range of sedentary work could perform Garcia's past job as a dispatcher, Mr. Cestar responded in the affirmative. Mr. Cestar also noted that the hypothetical claimant could work as a trouble locator or desktop helper. The hypothetical claimant, according to Mr. Cestar, could not work as either a dispatcher or trouble locator if he or she took a 10-15 minute break every 15 minutes or was off task for 20 percent of the time.

## II.    Procedural History

### A. The Commissioner's Decision

The ALJ found that, as of May 2012, Garcia had the following severe impairments: degenerative spondylolisthesis in her lower spine that required surgery in December 2012; a meniscus tear in her right knee; bursitis of her feet; and neuropathy in her left hand. Based on the opinion of Dr. Brahms, the ALJ determined that Garcia's back impairment met the listing from May 12, 2012, to June 1, 2013, but not before or after that period. In addition, the ALJ declined to find that pain in Garcia's right knee was disabling, asserting that the "clinical signs" with regards to the knee were "few" and that her "pain continued to be well managed with treatment." AR at 35–36.

As of June 1, 2013, according to the ALJ, Garcia had the residual functional capacity ("RFC") to perform the full range of sedentary work, based on Dr. Brahms's interrogatory responses that Garcia was able to perform sedentary exertion as of that date. The ALJ went on to find that as of June 1, 2013, Garcia was capable of performing her past work as a dispatcher, which did not require performing the specific work-related activities precluded by her RFC (such

as lifting or carrying extremely heavy weights). The ALJ concluded that Garcia was disabled from May 12, 2012, to June 1, 2013, but not before or after that period.

## B.  The Federal Action

Garcia seeks review of the Commissioner's decision under 42 U.S.C. § 405(g) and moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). She contends that the ALJ improperly afforded limited weight to her treating physicians and her own testimony regarding her conditions and symptoms, and overestimated her ability to sustain full-time employment for a sedentary job. The Commissioner cross-moves for judgment on the pleadings, arguing that the ALJ's decision was supported by substantial evidence and free from legal error.

## DISCUSSION

## I.    Standard of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The ALJ's disability determination may be set aside if it is not supported by substantial evidence. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Pursuant to 42 U.S.C. § 405(g), however, the factual findings of the Commissioner are conclusive when they are supported by substantial evidence.

See Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980). "[O]nce an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise." Brault v. Comm'r of Soc. Sec., 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and emphasis omitted).

Thus, "in order to accommodate 'limited and meaningful' review by a district court, the ALJ must clearly state the legal rules he applies and the weight he accords the evidence considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted). Without doing so, the ALJ deprives the court of the ability to determine accurately whether his opinion is supported by substantial evidence and free of legal error. Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").

## II.    Definition of Disability

The Social Security Act defines disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(2)(D). A claimant is determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.

§ 1382c(a)(2)(B).

The Social Security Administration has established a five-step sequential evaluation

process for making disability determinations. See 20 C.F.R. § 416.920(a)(4). The steps are

followed in sequential order. If it is determined that the claimant is not disabled at a step of the

evaluation process, the evaluation will not progress to the next step. The Court of Appeals has

described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 [(the "Listings")] . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform his past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). "The Social

Security regulations define residual functional capacity as the most the claimant can still do in a

work setting despite the limitations imposed by [her] impairments." Selian v. Astrue, 708 F.3d

409, 418 (2d Cir. 2013). "The claimant bears the burden of proof in the first four steps of the

sequential inquiry; the Commissioner bears the burden in the last." Selian, 708 F.3d at 418.

### III.    Treating Source Rule and Residual Functional Capacity

The ALJ determined that Garcia had the RFC to perform the full range of sedentary work

as of June 1, 2013, based on the opinions of Dr. Brahms, Dr. Auerbach, and Dr. Dassa. Garcia

asserts that her spinal impairments and right knee impairment currently meet the criteria for

Sections 1.04 and 1.02(A) of the Listings, respectively, and that, as a result of these impairments, she remains disabled and unable to work. She further contends that, had the ALJ correctly weighed the opinions of her treating physicians regarding the impairments in her spine and knee, his assessment of Garcia's RFC would have been different, and he would not have concluded that she was disabled for only a one-year period.

The Social Security regulations require the ALJ to give controlling weight to the opinions of "treating sources" when those opinions are well-supported by medical evidence and "not inconsistent with the other substantial evidence." 20 C.F.R. § 416.927(c)(2). Treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of impairments and may "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ." Id. A treating physician's opinion is generally entitled to "some extra weight" because "the treating source is inherently more familiar with a claimant's medical condition than are other sources." Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988). Therefore, when the ALJ discredits the opinion of a treating physician, he must follow a structured evaluative procedure and explain his decision. See Rolon v. Comm'r of Soc. Sec., 994 F. Supp. 2d 496, 506 (S.D.N.Y. 2014). The ALJ must consider: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) the consistency of the treating physician's opinion with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. See 20 C.F.R. § 416.927(c)(2)–(6); Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) ("In order to override the opinion of a treating physician . . . the ALJ must explicitly consider [the aforementioned

factors].”). The Commissioner must “always give good reasons in our notice of determination or decision for the weight we will give your treating source’s opinion.” 20 C.F.R. § 416.927(c)(2). Where an ALJ does not credit a treating physician’s findings, the claimant is entitled to an explanation. See Snell, 177 F.3d at 134. “The failure to provide good reasons for not crediting the opinion of a claimant’s treating physician is a ground for remand.” Greek v. Colvin, 820 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks omitted).

### A. Spinal Impairments

The ALJ’s finding that Garcia was disabled because of spinal impairments for only a closed period ending on June 1, 2013, is supported by substantial evidence. Her treating surgeon, Dr. Auerbach, consistently reiterated that her back pain was no longer of Listing-level severity as of June 2013. At a follow-up appointment on December 28, 2012, Dr. Auerbach stated that she “ha[d] done beautifully” with “no complications” and “only mild back pain.” AR at 295. Garcia was “at home walking upright” and was “very happy with her progress today.” Id. Dr. Auerbach repeated in February 2012 and March 2013 that Garcia was “doing beautifully from the clinical standpoint” and “improving nicely.” Id. at 585, 587. The mild to moderate back pain that Garcia was experiencing at the time was “obviously expected in early postoperative time point” and “well under control.” Id. at 585. According to Dr. Auerbach, Garcia did not need to wear a back brace.

Upon re-examination in August 2013, Dr. Auerbach found Garcia “really had an excellent outcome” from her surgery and had “done beautifully,” with significant improvement in her back pain compared to her pre-surgery condition. Id. at 701. He recommended that she continue light-duty work, change her position every 30 minutes, and sit down and take breaks if her back pain flared up. Overall, according to Dr. Auerbach, Garcia was “very happy with her

surgery." <u>Id.</u> Dr. Auerbach repeatedly described Garcia as "doing beautifully" with no gait abnormalities and only mild back pain that was under control. His August 2013 examination revealed negative straight leg raising, 5/5 motor strength, intact sensation, and no tenderness.

Based on Dr. Auerbach's records, Dr. Brahms concluded that Garcia was disabled because of spinal impairments for only a circumscribed period ending on June 1, 2013. There is no evidence of any impairment and no evidence of treatment or medical opinion referring to a condition before May 2012. With regards to the period after June 2013, Dr. Brahms determined that Garcia had less severe back pain, intact internal fixation, and only slight spondylothesis. According to Dr. Brahms, Garcia was able occasionally to lift and carry up to ten pounds, sit for six hours, stand for two hours, and walk for one hour. Although Dr. Brahms restricted Garcia from climbing ladders or scaffolds, stooping, kneeling, and working near unprotected heights, moving mechanical parts, and vibrations, nothing in Dr. Brahms's conclusion indicated that she could not perform sedentary work. In fact, his finding that she could sit for six hours and stand for two hours reinforces that Garcia was fully capable of performing sedentary work. <u>See id.</u> at 732–33. Dr. Brahms's opinion that Garcia could perform at the sedentary level is further corroborated by Dr. Dassa's assessment in November 2013 that she was capable of performing light duty work with a sit/stand option. <u>See id.</u> at 692–93. The ALJ's determination of a closed period of disability is supported by substantial evidence in the record. Moreover, the Court finds no legal error with the ALJ assigning Dr. Brahms's opinion significant weight.

### B. Knee Impairment

Garcia contends that the ALJ erred in not finding that her right knee impairment satisfied the Listing criteria. Listing 1.02 requires a major dysfunction of a joint, specifically "gross anatomical deformity" and "chronic joint pain and stiffness" with "signs of limitation of motion

or other abnormal motion of the affected joint(s)." 20 C.F.R., Part 404, Subpart P, Appendix 1, Listing 1.02A. Subpart A of Listing 1.02 further requires an "inability to ambulate effectively." Id.

Garcia has not demonstrated a "gross anatomical deformity" of her right knee. Diagnostic testing in July 2014 revealed a complex tear of the medial meniscus, moderate joint effusion, and mild osteoarthritis. None of these conditions qualifies as a gross anatomical deformity. Indeed, Dr. Brahms described the "early degenerative arthritic changes" in her knee as of "minimal consequence." Id. at 33, 81. He further concluded that these impairments would not interfere with her capacity to engage in sedentary exertion (i.e., sitting for periods of time and minimal weight-bearing). Garcia also failed to show that she is unable to ambulate effectively. In February 2013, Dr. Auerbach observed her walking without any assistive devices. A July 31, 2014 assessment form completed by Dr. Brahms indicated that she could ambulate without using a wheelchair, walker, canes or crutches. Her gait was observed on multiple occasions to be normal, both during and after the closed period of disability. See id. at 295 ("able to heel, toe walk without difficulty" in December 2012), 585 (Garcia denied any gait abnormality in February 2013), 587 (Garcia denied any gait abnormality in March 2013), 701 ("No gait abnormalities" in August 2013).

Furthermore, Garcia herself reported on at least two occasions that her knee pain was well-managed by injections. Garcia received an injection from Dr. Dassa in August 2013 in response to swelling and pain in her right knee. At a September 2013 appointment, she reported that the previous month's injection had reduced her pain by "two thirds" and requested a new injection. Id. at 698. Dr. Dassa observed a normal range of knee motion and 5/5 motor strength. The following month, Garcia received another injection into her right knee. At a follow-up

appointment on November 5, 2013, Garcia reported that the injections relieved a lot of her pain and rated her pain as three out of ten but requested additional injections that day because of excessive walking. In January 2014, the only negative findings regarding Garcia's knees were 1+ effusion, splinting, and guarding. Dr. Dassa noted that both knees had an active and full range of motion. In addition, although Garcia reported, in June 2014, difficulties in getting dressed and walking for more than two blocks, a contemporaneous physical examination showed that her knees were stable, her sensation was intact, straight leg raising test was negative, and her range of motion was normal. Accordingly, the ALJ's finding that Garcia's right knee pain did not meet the requirements of Listing 1.02A is well-supported by the evidence in the record.

## IV.    Credibility Assessment

Garcia argues that the ALJ improperly rejected her own account of her physical impairments. It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective estimate of the degree of her impairment. See Tejada v. Apfel, 167 F.3d 770, 775–76 (2d Cir. 1999); see also 20 C.F.R. § 416.929(b) (an individual's subjective complaints alone are not conclusive evidence of a disability). In making credibility determinations, the ALJ should consider "all of the available evidence," including the claimant's "history, the signs and laboratory findings," as well as statements from the claimant and her treating sources. C.F.R. § 416.929(c)(1). A court may set aside a credibility determination only when it is not supported by substantial evidence. Aponte v. Sec., Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984).

Garcia testified that her physical impairments have caused and continue to cause a significant degree of interference with activities of daily living. She could not lift a gallon of milk. She used a walker and a cane and would continue to do so unless advised by her doctor to

do otherwise. She wore a brace at all times and could not bend or retrieve an object she dropped. In addition, Garcia could not dress or otherwise groom herself. She needed help with cleaning and could not walk, sit or lie down for a period of time. Despite Garcia's allegations, the ALJ concluded that Garcia's account of the severity and persistence of her physical impairments was not credible.

The ALJ's credibility determination was supported by substantial evidence. Garcia's testimony of her impairments is inconsistent with her treating physicians' medical records and her own statements to the treating sources that her conditions were improving. Moreover, her reports of pain often included concessions that the pain was aggravated by actions outside of the ALJ's RFC (such as excessive walking) or corrective measures that she failed to heed (such as not wearing orthotics or shoe modifications).

First, Garcia mentioned she had "a lot of pain" in her back that started in December 2012. See AR at 54. Contrary to her contention, her treating surgeon observed sustained improvement. Beginning in as early as late December 2012, Dr. Auerbach consistently described Garcia as doing "beautifully." AR at 295, 584–85, 587. In addition, Dr. Brahms opined that Garcia was capable of sitting for up to six hours, standing for up to two hours, and walking for up to one hour. After reviewing diagnostic imaging for Garcia's back, Dr. Brahms reported that, after the back surgery in December 2012, Garcia had less severe back pain and that the internal fixation was intact.

In addition, at the February 14, 2014 hearing, Garcia testified she had knee pain and swelling. But, in August and September 2013, Garcia reported significant relief in her knee pain as a result of periodic injections. Orthopedic testing performed by Dr. Dassa in November 2012 and March 2013 (during the ALJ's period of disability) showed a normal range of motion in her

knees. In September 2013, Garcia told Dr. Dassa that injections had alleviated two thirds of her pain. Two months later, she reiterated that the injections were helping and rated her pain as only 3/10. Garcia admitted that excessive walking exacerbated her knee pain, which the ALJ's RFC of post-June 1, 2013 sedentary exertion accordingly takes into account. During an appointment with Dr. Schwechter in June 2014 for pain in her right knee, Garcia maintained that she could walk for less than two blocks at a time and found physical therapy to be unhelpful. But Dr. Schwechter's examination was unremarkable, revealing both knees to be stable and range of motion to be normal.

Besides back and knee pain, Garcia's foot pain appears to have been resolved after the circumscribed period of disability. In September 2012, Garcia complained that she had been experiencing pain in her left foot for the past six months. An examination showed 5/5 strength, no instability, and intact sensation but some tenderness in the plantar metatarsal heads. Garcia was diagnosed with bursitis and tendinitis, and received an injection. During a follow-up appointment in October 2012, she was given another injection, a night splint, and a shoe modification. But a month later, she displayed no instability or diminished nerve sensation; instead, a physical examination showed a full range of motion and stability. In addition, Garcia reported in November 2012 that her foot pain was occasional and only aggravated by walking (which sedentary exertion should not affect). At the time, she denied having any stiffness, pain or swelling in her left foot at a follow-up examination with Dr. Hernandez. Garcia sought treatment for foot pain sporadically throughout 2013. In April 2013, she was again diagnosed with bursitis and received another injection. Garcia reported feeling some exacerbation of pain in her foot in October 2013 but also admitted that she had not been using orthotics or shoe modifications. As of January 2014, Garcia informed Dr. Hernandez that her foot pain was getting better.

Finally, Garcia testified that she had carpal tunnel and numbness in her hands. The pain in Garcia's left hand, however, appears to have been fully treated after June 2013 as well. X-rays of the left hand and shoulder taken in March 2013 were unremarkable. After Garcia was diagnosed with neuropathy of the left hand in June 2013, she received steroid injections. At a follow-up appointment in November 2013, she reported that the previous injections relieved a lot of her pain. Her treating provider assessed minimal inflammation of her left hand and a full range of motion.

Accordingly, the ALJ's credibility determination rests on substantial evidence. In addition, his assessment reflects due consideration of the inconsistencies between Garcia's subjective complaints of pain and the findings and opinions of the treating and consultative sources. Therefore, there is no basis to set it aside.

**V.  Step Five: Past Work as Dispatcher**

Garcia contends that she cannot return to her past work as a dispatcher because the responsibilities of a dispatcher are inconsistent with the "numerous restrictions" imposed by her treating doctors, as well as by the ALJ's RFC determination. This argument is not persuasive.

Garcia acknowledged that her past employment as a dispatcher was sedentary in nature. She was never required to lift anything. See AR at 117–18. The job consisted primarily of "data input" and could be performed while sitting down at a desk. See id. at 82 (affirming that she sat eight hours a day "in front of a computer"); 118 ("Q: As long as you got the job done, nobody cared if you sat or stood; is that correct? A: Right, right."). In addition, the job allowed her to take breaks to stretch and stand, if necessary. Based on Garcia's description of her past employment, the vocational expert testified that there were "no restrictions against sedentary work," that her back problems necessitated restrictions for "standing a long time and lifting

heavy objects," and that she was capable of performing "fine manipulation" for tasks such as data entry. Id. at 83–84. The vocational expert ultimately concluded that a hypothetical claimant who could perform the full range of sedentary work would be able to perform Garcia's past work as a dispatcher. See id. at 92–95. Furthermore, Dr. Brahms opined that Garcia was able to sit for up to six hours. The ALJ incorporated Garcia's testimony and the opinions from treating and consultative sources in his determination at Step Five.

The ALJ's Step Five analysis was supported by substantial evidence and consistent with Garcia's own description of her past job. The ALJ reviewed evidence and heard testimony that Garcia was capable of sedentary exertion and that any restrictions such as lifting or standing for long periods would be accommodated. The Court is limited to determining whether a reasonable person could conclude, based on the evidence, whether Garcia retained the capacity to perform her past work as a dispatcher, which involved primarily sitting at a desk for periods of time. The ALJ based his conclusion that she could do so on substantial evidence in the record, and there is no basis for overturning it.

## CONCLUSION

For the reasons stated above, Garcia's motion for judgment on the pleadings is DENIED, and the Commissioner's cross-motion for judgment on the pleadings is GRANTED.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 14 and 16.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:     August 15, 2017
           New York, New York